608 F.2d 327
 19 Fair Empl.Prac.Cas. 1493, 19 Empl. Prac.
Dec. P 9271
Robert DeSANTIS, Bernard Boyle, and all others similarly
situated, Plaintiffs-Appellants,
v.
PACIFIC TELEPHONE AND TELEGRAPH CO., INC., a corporation, et
al., Defendants-Appellees.
Donald STRAILEY, Plaintiff-Appellant,
v.
HAPPY TIMES NURSERY SCHOOL, INC., a California Corporation,
Wilda Lundborg, President and Director, and Does 1
through 10, Defendants-Appellees.
Judy LUNDIN and Barbara Buckley, Plaintiffs-Appellants,
v.
PACIFIC TELEPHONE AND TELEGRAPH CO., INC., and the
Communication Workers of America, Defendants-Appellees.
 Nos. 77-1109, 77-1204 and 77-1662.
 United States Court of Appeals,
Ninth Circuit.
 May 31, 1979.
Rehearing Denied July 12, 1979.
 
 Richard Gayer, San Francisco, Cal., for plaintiffs-appellants.
 Harold R. Crookes, San Francisco, Cal., William H. Ng, Atty., Washington, D. C., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before CHOY and SNEED, Circuit Judges, and BONSAL,* District Judge.
 CHOY, Circuit Judge:
 
 
 1
 Male and female homosexuals brought three separate federal district court actions claiming that their employers or former employers discriminated against them in employment decisions because of their homosexuality. They alleged that such discrimination violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1985(3). The district courts dismissed the complaints as failing to state claims under either statute. Plaintiffs below appealed. Because of the similarity of issues involved, this court consolidated the appeals at the request of counsel for appellants. We affirm.
 
 I. Statement of the Case
 
 2
 A. Strailey v. Happy Times Nursery School, Inc.
 
 
 3
 Appellant Strailey, a male, was fired by the Happy Times Nursery School after two years' service as a teacher. He alleged that he was fired because he wore a small gold ear-loop to school prior to the commencement of the school year. He filed a charge with the Equal Employment Opportunity Commission (EEOC) which the EEOC rejected because of an alleged lack of jurisdiction over claims of discrimination based on sexual orientation. He then filed suit on behalf of himself and all others similarly situated, seeking declaratory, injunctive, and monetary relief. The district court dismissed the complaint as failing to state a claim under either Title VII or § 1985(3).
 
 
 4
 B. DeSantis v. Pacific Telephone & Telegraph Co.
 
 
 5
 DeSantis, Boyle, and Simard, all males, claimed that Pacific Telephone & Telegraph Co. (PT&T) impermissibly discriminated against them because of their homosexuality. DeSantis alleged that he was not hired when a PT&T supervisor concluded that he was a homosexual. According to appellants' brief, "BOYLE was continually harrassed by his co-workers and had to quit to preserve his health after only three months because his supervisors did nothing to alleviate this condition." Finally, "SIMARD was forced to quit under similar conditions after almost four years of employment with PT&T, but he was harrassed by his supervisors (as well) . . . . In addition, his personnel file has been marked as not eligible for rehire, and his applications for employment were rejected by PT&T in 1974 and 1976." Appellants DeSantis, Boyle, and Simard also alleged that PT&T officials have publicly stated that they would not hire homosexuals.
 
 
 6
 These plaintiffs also filed charges with the EEOC, also rejected by the EEOC for lack of jurisdiction. They then filed suit on behalf of themselves and all others similarly situated seeking declaratory, injunctive, and monetary relief under Title VII and § 1985(3). They also prayed that the district court issue mandamus commanding the EEOC to process charges based on sexual orientation. The district court dismissed their complaint. It held that the court lacked jurisdiction to compel the EEOC to alter its interpretation of Title VII. It also held that appellants had not stated viable claims under either Title VII or § 1985(3).
 
 C. Lundin v. Pacific Telephone & Telegraph
 
 7
 Lundin and Buckley, both females, were operators with PT&T. They filed suit in federal court alleging that PT&T discriminated against them because of their known lesbian relationship and eventually fired them. They also alleged that they endured numerous insults by PT&T employees because of their relationship. Finally, Lundin alleged that the union that represented her as a PT&T operator failed adequately to represent her interests and failed adequately to present her grievance regarding her treatment. Appellants sought monetary and injunctive relief. The district court dismissed their suit as not stating a claim upon which relief could be granted. It also refused leave to amend their complaint to add a claim under § 1985(3).
 
 II. Title VII Claim
 
 8
 Appellants argue first that the district courts erred in holding that Title VII does not prohibit discrimination on the basis of sexual preference. They claim that in prohibiting certain employment discrimination on the basis of "sex," Congress meant to include discrimination on the basis of sexual orientation. They add that in a trial they could establish that discrimination against homosexuals disproportionately effects men and that this disproportionate impact and correlation between discrimination on the basis of sexual preference and discrimination on the basis of "sex" requires that sexual preference be considered a subcategory of the "sex" category of Title VII. See 42 U.S.C. § 2000e-2.
 
 
 9
 A. Congressional Intent in Prohibiting "Sex" Discrimination
 
 
 10
 In Holloway v. Arthur Andersen & Co., 566 F.2d 659 (9th Cir. 1977), plaintiff argued that her employer had discriminated against her because she was undergoing a sex transformation and that this discrimination violated Title VII's prohibition on sex discrimination. This court rejected that claim, writing:
 
 
 11
 The cases interpreting Title VII sex discrimination provisions agree that they were intended to place women on an equal footing with men. (Citations omitted.)
 
 
 12
 Giving the statute its plain meaning, this court concludes that Congress had only the traditional notions of "sex" in mind. Later legislative activity makes this narrow definition even more evident. Several bills have been introduced to Amend the Civil Rights Act to prohibit discrimination against "sexual preference." None have (Sic ) been enacted into law.
 
 
 13
 Congress has not shown any intent other than to restrict the term "sex" to its traditional meaning. Therefore, this court will not expand Title VII's application in the absence of Congressional mandate. The manifest purpose of Title VII's prohibition against sex discrimination in employment is to ensure that men and women are treated equally, absent a bona fide relationship between the qualifications for the job and the person's sex.
 
 
 14
 Id. at 662-63 (footnotes omitted); See Baker v. California Land Title Co., 507 F.2d 895, 896 & n.2 (9th Cir. 1974), Cert. denied, 422 U.S. 1046, 95 S.Ct. 2664, 45 L.Ed.2d 699 (1975); Rosenfeld v. Southern Pacific Co., 444 F.2d 1219, 1225 (9th Cir. 1971).
 
 
 15
 Following Holloway, we conclude that Title VII's prohibition of "sex" discrimination applies only to discrimination on the basis of gender[1] and should not be judicially extended to include sexual preference such as homosexuality.[2] See Smith v. Liberty Mutual Insurance Co., 569 F.2d 325, 326-27 (5th Cir. 1978); Holloway, 566 F.2d at 662-63; Voyles v. Ralph K. Davies Medical Center, 403 F.Supp. 456, 456-57 (N.D.Cal.1975), Aff'd without published opinion, 570 F.2d 354 (9th Cir. 1978).[3]
 
 B. Disproportionate Impact
 
 16
 Appellants argue that recent decisions dealing with disproportionate impact require that discrimination against homosexuals fall within the purview of Title VII. They contend that these recent decisions, like Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), establish that any employment criterion that affects one sex more than the other violates Title VII. They quote from Griggs:
 
 
 17
 What is required by Congress (under Title VII) is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classifications.
 
 
 18
 401 U.S. at 431, 91 S.Ct. at 853. They claim that in a trial they could prove that discrimination against homosexuals disproportionately affects men both because of the greater incidence of homosexuality in the male population and because of the greater likelihood of an employer's discovering male homosexuals compared to female homosexuals.
 
 
 19
 Assuming that appellants can otherwise satisfy the requirement of Griggs, we do not believe that Griggs can be applied to extend Title VII protection to homosexuals. In finding that the disproportionate impact of educational tests on blacks violated Title VII, the Supreme Court in Griggs sought to effectuate a major congressional purpose in enacting Title VII: protection of blacks from employment discrimination. For as the Supreme Court noted in Philbrook v. Goldgett, 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975), in construing a statute, "(o)ur objective . . . is to ascertain the congressional intent and give effect to the legislative will." Id. at 713, 95 S.Ct. at 1898.
 
 
 20
 The Holloway court noted that in passing Title VII Congress did not intend to protect sexual orientation and has repeatedly refused to extend such protection. See part IIA Supra. Appellants now ask us to employ the disproportionate impact decisions as an artifice to "bootstrap" Title VII protection for homosexuals under the guise of protecting men generally.
 
 
 21
 This we are not free to do. Adoption of this bootstrap device would frustrate congressional objectives as explicated in Holloway, not effectuate congressional goals as in Griggs. It would achieve by judicial "construction" what Congress did not do and has consistently refused to do on many occasions. It would violate the rule that our duty in construing a statute is to "ascertain . . . and give effect to the legislative will." Philbrook, 421 U.S. at 713, 95 S.Ct. at 1898. We conclude that the Griggs disproportionate impact theory may not be applied to extend Title VII protection to homosexuals.[4]
 
 C. Differences in Employment Criteria
 
 22
 Appellants next contend that recent decisions have held that an employer generally may not use different employment criteria for men and women. They claim that if a male employee prefers males as sexual partners, he will be treated differently from a female who prefers male partners. They conclude that the employer thus uses different employment criteria for men and women and violates the Supreme Court's warning in Phillips v. Martin-Marietta Corp., 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971):
 
 
 23
 The Court of Appeals therefore erred in reading this section as permitting one hiring policy for women and another for men . . . .
 
 Id. at 544, 91 S.Ct. at 497.[5]
 
 24
 We must again reject appellants' efforts to "bootstrap" Title VII protection for homosexuals. While we do not express approval of an employment policy that differentiates according to sexual preference, we note that whether dealing with men or women the employer is using the same criterion: it will not hire or promote a person who prefers sexual partners of the same sex. Thus this policy does not involve different decisional criteria for the sexes.
 
 D. Interference with Association
 
 25
 Appellants argue that the EEOC has held that discrimination against an employee because of the race of the employee's friends may constitute discrimination based on race in violation of Title VII. See EEOC Dec. No. 71-1902, (1972) Empl.Prac.Guide (CCH) P 6281; EEOC Dec. No. 71-969, (1972) Empl.Prac.Guide (CCH) P 6193. They contend that analogously discrimination because of the sex of the employees' sexual partner should constitute discrimination based on sex.
 
 
 26
 Appellants, however, have not alleged that appellees have policies of discriminating against employees because of the gender of their friends. That is, they do not claim that the appellees will terminate anyone with a male (or female) friend. They claim instead that the appellees discriminate against employees who have a certain type of relationship I. e., homosexual relationship with certain friends. As noted earlier, that relationship is not protected by Title VII. See part IIA Supra. Thus, assuming that it would violate Title VII for an employer to discriminate against employees because of the gender of their friends, appellants' claims do not fall within this purported rule.
 
 E. Effeminacy
 
 27
 Appellant Strailey contends that he was terminated by the Happy Times Nursery School because that school felt that it was inappropriate for a male teacher to wear an earring to school. He claims that the school's reliance on a stereotype that a male should have a virile rather than an effeminate appearance violates Title VII.
 
 
 28
 In Holloway this court noted that Congress intended Title VII's ban on sex discrimination in employment to prevent discrimination because of gender, not because of sexual orientation or preference. See part IIA Supra. Recently the Fifth Circuit similarly read the legislative history of Title VII and concluded that Title VII thus does not protect against discrimination because of effeminacy. Smith v. Liberty Mutual Insurance Co., 569 F.2d at 326-27.[6] We agree and hold that discrimination because of effeminacy, like discrimination because of homosexuality (part IIA Supra ) or transsexualism (Holloway ), does not fall within the purview of Title VII.
 
 E. Conclusion as to Title VII Claim
 
 29
 Having determined that appellants' allegations do not implicate Title VII's prohibition on sex discrimination, we affirm the district court's dismissals of the Title VII claims.[7]
 
 III. S 1985(3) Claim
 
 30
 The district courts dismissed the male appellants' claims under 42 U.S.C. § 1985(3). The district court also refused to allow the women appellants to amend their complaint to state a claim under § 1985(3). We affirm.
 
 
 31
 Section 1985(3)[8] provides in relevant part:
 
 
 32
 If two or more persons . . . conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.
 
 
 33
 Appellants argue that the concerted actions of various agents of their employers and others, to effectuate the discriminatory policy of the employers constituted a conspiracy in violation of § 1985(3). They conclude that regardless of this court's holding as to Title VII, they can assert a viable § 1985(3) claim.
 
 
 34
 The forerunner of § 1985(3) was enacted as part of the Ku Klux Klan Act of 1871. Act of April 20, 1871, ch. 22, § 2, 17 Stat. 13, 13-14. It was intended to provide special federal assistance to southern blacks and their allies in protecting their rights under the fourteenth amendment and other reconstruction legislation against the Ku Klux Klan and others organized to thwart reconstruction efforts. See Cong.Globe, 42d Cong., 1st Sess., 426 (remarks of Rep. McKee); Id. at 438-39 (remarks of Rep. Cobb); J. Franklin, Reconstruction: After the Civil War 166-68 (1961).
 
 
 35
 A century later the Supreme Court held that § 1985(3) applied only when there is "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). Because Griffin dealt with allegations by blacks of a conspiracy to deprive them of their civil rights, the Supreme Court did not decide "whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable" under § 1985(3). Id. at 102 n.9, 91 S.Ct. at 1798, n.9.
 
 
 36
 In Life Insurance Co. of North America v. Reichardt, 591 F.2d 499 (9th Cir. 1979), this court held that plaintiffs alleging a conspiracy to deprive women of equal rights could invoke § 1985(3). 591 F.2d at 502. Appellants here claim that since Reichardt moved beyond the narrow historical perspective of 1871, homosexuals (and all groups) can now claim the special protection of § 1985(3).
 
 
 37
 We disagree. While § 1985(3) has been liberated from the now anachronistic historical circumstances of reconstruction America, we may not uproot § 1985(3) from the principle underlying its adoption: the Governmental determination that some groups require and warrant special federal assistance in protecting their civil rights. This underlying principle must continue to determine the coverage of § 1985(3).
 
 
 38
 In contradistinction to southern blacks of 1871, the blacks of Griffin, and the women of Reichardt, it cannot be said that homosexuals have been afforded special federal assistance in protecting their civil rights. The courts have not designated homosexuals a "suspect" or "quasi-suspect" classification so as to require more exacting scrutiny of classifications involving homosexuals. Cf. Doe v. Commonwealth's Attorney, 403 F.Supp. 1199, 1202 (E.D.Va.1975) (three judge court) (constitutionality of Virginia sodomy law upheld against due process and other challenges under legitimate interest and rational relationship tests), Aff'd mem., 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976). And as noted in part II Supra, Congress did not and has consistently refused to include homosexuals as a group within the special protection of Title VII. See 42 U.S.C. § 2000e-2.
 
 
 39
 We conclude that homosexuals are not a "class" within the meaning of § 1985(3). The district courts therefore properly rejected appellants' § 1985(3) claims.[9]
 
 
 40
 AFFIRMED.
 
 
 41
 SNEED, Circuit Judge (concurring and dissenting):
 
 
 42
 I concur in the majority's opinion save subpart B of Part II thereof.
 
 
 43
 I respectfully dissent from subpart B which holds that male homosexuals have not stated a Title VII claim under the disproportionate impact theories of Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). My position is not foreclosed by our holding, with which I agree, that Title VII does not afford protection to homosexuals, male or female. The male appellants' complaint, as I understand it, is based on the contention that the use of homosexuality as a disqualification for employment, which for Griggs' purposes must be treated as a facially neutral criterion, impacts disproportionately on Males because of the greater visibility of male homosexuals and a higher incidence of homosexuality among males than females.
 
 
 44
 To establish such a claim will be difficult because the male appellants must prove that as a result of the appellee's practices there exists discrimination against males Qua males. That is, to establish a prima facie case under Griggs it will not be sufficient to show that appellees have employed a disproportionately large number of female Homosexuals and a disproportionately small number of male Homosexuals. Rather it will be necessary to establish that the use of homosexuality as a bar to employment disproportionately impacts on males, a class that enjoys Title VII protection. Such a showing perhaps could be made were male homosexuals a very large proportion of the total applicable male population.
 
 
 45
 My point of difference with the majority is merely that the male appellants in their Griggs claim are not using that case "as an artifice to 'bootstrap' Title VII protection for homosexuals under the guise of protecting men generally." (p. 2011). Their claim, if established properly, would in fact protect males generally. I would permit them to try to make their case and not dismiss it on the pleadings.
 
 
 46
 With respect to the appellants' section 1985(3) claims (Part III of the majority opinion), I should like to observe that the appellants fail because discrimination against homosexuals does not rest on the class-based, invidiously discriminatory animus required by section 1985(3), as interpreted by Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Many groups, quite satisfactorily subject to identification, are not within the ambit of section 1985(3)'s protection.[1] This section is not a writ by which the judiciary can provide comfort and succor to all groups, large and small, who feel social disapproval from time to time. Like many others, homosexuals do not enjoy section 1985(3) protection.
 
 
 
 *
 The Honorable Dudley B. Bonsal, Senior U. S. District Judge, for the Southern District of New York, sitting by designation
 
 
 [1]
 Judge Goodwin dissented in Holloway because he concluded that plaintiff may have alleged that she was discriminated against because she was a women rather than because she had undergone a particular medical treatment. 566 F.2d at 664-65
 
 
 [2]
 The Holloway court wrote: "One court has found that Title VII does not protect homosexuals. . . . Smith v. Liberty Mutual Ins. Co., 395 F.Supp. 1098 (N.D.Ga.1975)." 566 F.2d at 662 n.6. Smith was affirmed by the Fifth Circuit. 569 F.2d 325 (5th Cir. 1978)
 
 
 [3]
 Based on a similar reading of the legislative history and the principle that "words used in statutes are to be given their ordinary meaning," the EEOC has concluded "that when Congress used the word sex in Title VII it was referring to a person's gender" and not to "sexual practices." EEOC Dec. No. 76-75, (1976) Emp.Prac.Guide (CCH) P 6495, at 4266
 We have recently noted:
 (T)hough the courts remain the final interpreters of an act of Congress (citations omitted), the courts have repeatedly recognized that an administrative agency's reasonable interpretation of the statute which it administers is deserving of considerable respect. See New York Department of Social Services v. Dublino, 413 U.S. 405, 421, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); White v. United States Civil Service Commission, 468 F.2d 1357, 1358 (9th Cir. 1972).
 Smith v. Califano, 597 F.2d 152, 156 (9th Cir. 1979) (footnote omitted).
 
 
 [4]
 Appellants do not contend that any prior decision of any federal court has applied the disproportionate impact analysis to extend Title VII protection to homosexuals. Recent cases have typically applied the analysis to protect racial minority groups and women. See, e. g., Dothard v. Rawlinson, 433 U.S. 321, 331, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (height and weight requirements disproportionately affecting women); Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (tests disproportionately affecting blacks); Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (tests disproportionately affecting blacks); Davis v. County of Los Angeles, 566 F.2d 1334, 1341 (9th Cir. 1977) (height requirements disproportionately affecting Chicanos); Gibson v. Local 40, 543 F.2d 1259, 1267 n.16 (9th Cir. 1976) (tests disproportionately affecting blacks)
 
 
 [5]
 We assume Arguendo that appellants have correctly stated the applicable law
 
 
 [6]
 In Holloway this court cited approvingly the district court decision affirmed by the Fifth Circuit in Smith. 566 F.2d at 662 n.6. The district court had reached the same conclusion as did the Fifth Circuit. 395 F.Supp. at 1101
 
 
 [7]
 Given our conclusion, we need not address appellees' contention that the women plaintiffs' failure to file charges with the EEOC prevented them from suing under Title VII. See 42 U.S.C. § 2000e-5(e). Additionally, we need not determine if the district court would have jurisdiction to order the EEOC to alter its interpretation of Title VII were it inconsistent with relevant judicial authority
 
 
 [8]
 The 1976 edition of United States Code labels this provision as § 1985(c). However, we will refer to the provision as § 1985(3) in conformity with standard practice in order to avoid confusion
 
 
 [9]
 Given our conclusion, there would be no purpose in allowing the women plaintiffs the opportunity to amend their complaint to add a § 1985(3) claim
 
 
 [1]
 See, e. g., McLellan v. Mississippi Power & Light Co., 545 F.2d 919, 928-29, 931-33 (5th Cir. 1977) (en banc) (bankrupts); Lessman v. McCormick, 591 F.2d 605 (10th Cir. 1979) (debtors). McLellan at 928-29 mentions blacklisted employees, doctors who testified against their brethren in malpractice cases, protestors on university campuses, newspaper dealers, policemen, and others as classes to which section 1985(3) has been held not to apply
 The reasoning of the McLellan decision is particularly persuasive in this context. The McLellan court noted: (1) that the legislative history of the Act provides no suggestion that Congress had been concerned about discrimination against insolvents, 545 F.2d at 932; (2) that acknowledging that the protection afforded by the civil rights acts is not static does not suffice to bring bankrupts within the scope of the Act when Congress had specifically refused to prohibit discrimination against bankrupts and when the Supreme Court had refused to characterize the right to file a bankruptcy petition as a fundamental right, Id. at 932-33. The court declined to enlarge the ambit of § 1985 to include bankrupts, stating that it did not believe that Congress had intended to protect every class over which it had power to legislate.
 There is no indication that Congress was concerned about discrimination against homosexuals when it passed the Ku Klux Klan Act; subsequently, Congress has, on several occasions, specifically declined to protect homosexuals from employment discrimination, See Holloway v. Arthur Andersen & Co., 566 F.2d 659, 662 & n.6 (9th Cir. 1977); and the Supreme Court, on at least one occasion, declined to characterize consensual homosexual behavior as a fundamental right, Doe v. Commonwealth's Attorney, 403 F.Supp. 1199 (E.D.Va.1975), Aff'd mem., 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976) (constitutionality of Virginia sodomy law upheld in declaratory judgment action against due process, freedom of expression, and privacy attacks). I therefore find little difficulty differentiating homosexuals from other groups, such as women, or various political groups, for whom class protection under § 1985 has, in some Circuits, been found to exist. See, e. g., Life Insurance Co. of North America v. Reichardt, 591 F.2d 499 (9th Cir. 1979) (women); Means v. Wilson, 522 F.2d 833 (8th Cir. 1975), Cert. denied, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976) (political opponents); Cameron v. Brock, 473 F.2d 608 (6th Cir. 1973) (supporters of political candidate). Homosexuals do not comprise a group which federal statutory or constitutional law deems in need of protection from group harassment, hence, homosexuals do not constitute a protected class for purposes of § 1985.